## Fraim v. Katz

*Sidney Bernstein*, for plaintiff.

*Joseph J. Serritella*, for defendant.

TAKIFF, J., May 2, 1975.—Plaintiff, Joseph E. Fraim, individually and trading as Fraim Construction Company (Fraim) brought this action in trespass against Subcontractors Association of Delaware Valley (SADV), Emanuel B. Katz and numerous defendants, including F. H. Sparks Company of Pennsylvania, Inc. (Sparks), claiming damages in excess of $20,000,000 upon separate counts in trade libel, intentional infliction of pecuniary damage and negligence. The basis of the claim is that by publication of certain letters containing false statements regarding plaintiff's financial situation, Katz, the SADV and various members of it, including Sparks, damaged Fraim Construction Company's business reputation and forced its

liquidation. Presently before the court is a motion for summary judgment by Sparks, which we deny.

The facts, basically uncontested, are as follows:

The SADV is a Pennsylvania nonprofit corporation chartered on October 18, 1968, with a membership consisting of any person, partnership or corporation which is principally engaged in any phase or branch of work as a subcontractor in the building industry in the Delaware Valley. Sparks is such a company and as of October and November 1970, the material times of this case, was a member of SADV. The association had some 157 members and a mailing list of approximately 850 persons, organizations and business enterprises comprised of the members, the 27 American Subcontractor Association (ASA) Chapters, and also miscellaneous bonding and construction companies.

Defendant Katz was president and sole stockholder in Tubular Products, Inc. (Tubular) and was also a member of the SADV. Neither he nor Sparks nor any of their respective employes were officers of the association. Katz had been a member for several years prior to the material time, but he had been an inactive member. Although he paid his bills, he had only been to four meetings before October 1970.

On October 22, 1970, a general meeting of the SADV membership was held at which Katz attended but which neither Sparks nor any of its employes attended. At that meeting, attended by over 50 members, the subject of contractors failing to pay amounts due to subcontractors arose. The name of Fraim Construction was heard frequently ("there was more outcry concerning Mr. Fraim's account than anybody else. I think he won the thing by acclamation": Katz' deposition.). The president of SADV, a Mr. Derago, suggested at the meeting that a creditors' committee be formed but nothing further was done in that regard. After the

meeting, Mr. Katz approached Mr. Derago and said if there were to be a committee, he would like to be on it, since Fraim was indebted to his company. The president then and there appointed Katz chairman of the committee and told him to organize it "to see what action we could take as a group to get collection": Katz' deposition.

Thereafter, Katz drafted a letter dated October 26, 1970, apparently with the aid of counsel for the association, Mr. Levine, and its Executive Director, Colonel MacMillan. The letter was written on SADV stationery and was signed by Mr. Katz as "Chairman, Creditors' Committee". The letter announced that there would be a creditors' meeting November 2nd for "all companies owed money by Fraim Construction Co." and requested all such to submit a statement indicating the amount of their indebtedness. The letter concluded by saying:

"The purpose of this meeting is to decide how to bring collection pressure on Fraim to pay his bills. The only way we can win is to act together. If you know of any non-members who are having problems, please have them contact me."

That letter was sent to all of the SADV members, the ASA chapters and SADV legal counsel without identification as to the "members" of the creditors' committee and without limitation as to addresses who were indeed creditors of Fraim.

Walter D. Beddall, Jr. was then employed by Sparks as office manager and pursuant to the invitation to creditors he attended the November 2nd meeting, chaired by Mr. Katz. The meeting was attended by 25 other persons representing 23 other firms. Four creditors who were unable to attend sent information concerning their claims. The minutes of this meeting suggest that several courses of proposed action were

considered. Mr. Katz would meet with Mr. Fraim on November 6th and would demand payment for known claims. If Fraim refused to pay, the "committee", still unspecified beyond Mr. Katz, would contact all subcontractors by letter followed by letters to owners, architects and bonding companies. Finally, if complete cooperation were lacking, a further meeting would be held. Exactly how the agreement came about to pursue these alternatives is not clear. There was no formal vote of any kind taken and, at most, it appears to be the consummation of shouts from the floor.

Mr. Beddall signed the attendance log and indicated to Mr. Katz that Fraim had several outstanding accounts with Sparks. Mr. Beddall did not participate actively in the creditors' meeting and never indicated that he endorsed the proposed course of action or that he wished to be a member of the creditors' committee on behalf of Sparks.

After the meeting, Katz made up a chart of creditors —the creditor's name, the job done and the amount owing. The information from which the chart was prepared was collated from oral representations at the meeting and from telephone conversations and written statements before and after the meeting. Next to Sparks' name on the chart was an entry showing that it had performed work for Fraim on two projects described as "Sandy Run" and "Blue Mountain", but there was no amount appearing in the amount column. Mr. Katz said, in deposition, the reason for this probably was Sparks' representative did not have the figures handy.

Thereafter, Mr. Katz determined that he could not meet the plaintiff November 6th because plaintiff had to go to the hospital. On November 9th, Katz received a letter from Mr. Fraim saying he would meet with the committee November 20th. On November 12th, Katz

had two documents, Exhibits C and D to the complaint, drawn up and they were sent to all the 850 persons and entities on SADV's mailing list. Exhibit "C" was a missive entitled "Important Notice" wherein it is announced that "the following creditors of the *Fraim Construction Company*" had formed a creditors' committee to attempt to effect collection of moneys owed by plaintiff by means of a joint effort. Included in the list of names is defendant Sparks. The notice went on to state a list of jobs for which money was owing and included therein is "Blue Mountain" and "Sandy Run". The notice concludes by saying:

"These creditors represent a known (but as yet incomplete) total of $404,779.24 in claims. If you are a creditor of Fraim, we should be happy to have you join the group. Please get in touch with the undersigned as soon as possible."

It was signed by Mr. Katz as "Chairman of the Creditors' Committee."

This letter was drafted to accomplish the purpose of determining, as well as possible, the amount of claims against plaintiff then outstanding in order to have a complete picture for the upcoming meeting with him. Mr. Katz in his deposition said that he did not authorize increasing the mailing to include SADV's total mailing list, but that this decision must have been made by SADV officials when it did the mailing. Neither Sparks nor his employes nor, indeed, any other of the creditors listed had told or advised Katz to send this letter nor had any prior notice that it was going to be sent. Nor did any of the named companies who had previously attended a meeting of creditors authorize the inclusion of their names as "members" of the creditors' committee. Mr. Katz repeatedly stated in his deposition that he "assumed" that if a company either had representatives attend the November 2nd

meeting or gave information about Fraim being indebted to it, that company wished to be a member of the committee and to join in its joint effort to try to secure payment.

Sparks acknowledges receipt of Exhibit C but says that it was received "sometime after November 12": defendant Sparks' motion for summary judgment.

Exhibit "D" is a document entitled "Flash! To All Fraim Creditors" and announces the proposed November 20, 1970, meeting with plaintiff and its time and place. Further along it says,

"The purpose of the meeting will be to discuss and arrive at specific payment schedules for moneys owed by Fraim to the participating subcontractors."

It then urges:

"If you are a Fraim creditor, *you should attend* this meeting. Bring with you specific data concerning *amounts owed and what job.*"

Again it is signed by Mr. Katz as "Chairman, Creditors' Committee." This was also sent out November 12th (Katz deposition), but it is not clear when defendant Sparks received it. Again, this letter was sent out to the association's full mailing list, and Sparks denies participation in its authorization, its preparation or publication, and further denies any prior knowledge of it. Parenthetically, it should be observed that the invitation was extended to attend as a "Fraim creditor", not as a member of any creditors' committee.

On November 16, 1970, Edward Carney, Fraim's counsel, sent a letter to Mr. Katz (Exhibit E attached to plaintiff's memorandum in opposition to defendant Katz's motion for summary judgment) wherein he made reference to the "Important Notice" and "Flash!" letters and warned that Fraim's business was suffering adversely therefrom. He further stated that Fraim would not attend the November 20th meeting and that

legal action would be instituted against the SADV, the committee and its members. At the bottom of the letter, it is noted that copies were to be sent to E. B. Katz (although he was recipient of the letter) and "all members of Creditors Committee." Whether Sparks received this letter is an open question.

On November 20, 1970, the proposed meeting of creditors was held. Sparks sent two representatives, Mr. Beddall and a John Burke, another Sparks employe. At the meeting, Katz reported that Mr. Fraim refused to cooperate, and it was decided, although exactly how is unclear, not to meet again.

Several additional matters bear mention. Exhibit "B" to the complaint, heretofore unmentioned, is a letter from M. V. Mayer, Credit Manager of the Otis Elevator Co., to United States Fidelity and Guarantee Company, Sparks' bonding company on one of its jobs, a copy of which was allegedly forwarded to SADV, notifying that Fraim allegedly owed $1,180 on the installation of an elevator in the Tredyffrin-Easttown Junior High School. Sparks denies prior knowledge of the letter and denies any participation in its preparation or publication.

It also appears that the Ronald A. Bove Company by letters of November 19th and December 7th disavowed any representation that it was a Fraim creditor or that it wished to be a member of the committee. Mr. Katz responded to Bove's counsel, Mr. Orlovsky, that Bove's representative had attended a creditors' committee meeting but if it wished to disassociate itself, Katz would furnish a list of names and addresses to which the notices were sent.

Finally, while it is certain that the SADV had never before organized a creditors' committee, Mr. Katz had done so with a limited degree of success, several years earlier.

It is clear from the above recital of facts that Sparks did not directly prepare or publish the documents in question, and it cannot be liable upon a theory of direct culpability. Also, if the collection venture is seen as the SADV's project alone, liability will not fix upon Sparks simply because it is a member of the association. The concept of "limited liability" as it applies to members of nonprofit corporations would prevent such a finding. The law in Pennsylvania on this subject is set forth in section 610 of the Act of May 5, 1933, P. L. 289, art. VI (15 PS §7610), as follows:

"The members of a nonprofit corporation shall not be personally liable for the debts, liabilities, or obligations of the corporation."

Therefore, if Sparks is to be legally liable at all, it must be upon a theory of vicarious liability. The question then arises as to whether Sparks and/or its employes Burke and Beddall, vested in Katz authority to prepare and publish the documents or represented to Fraim that Katz had apparent authority to do so, or, finally, if neither obtains, whether Sparks or its employes affirmed and ratified the conduct of Katz as being on its (Sparks) behalf.

A court may only grant summary judgment in cases which are free and clear from doubt and where there are no controlling issues of fact raised by the pleadings: Fry v. Stetson, 70 Montg. 175, affirmed 176 Pa. Superior Ct. 171, 106 A.2d 662 (1954).

Authority is defined in the Restatement, 2d, Agency as:

"Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him": sec. 7

An agent is privileged to act for a principal only because of the latter's manifestations of consent to him. While such manifestations may be made by conduct, as well as orally or verbally (Comment C), the inference of consent to the agent *must be reasonable* (Comment B). Katz testified over and again in his deposition that he inferred consent on behalf of creditors to join the committee and to act collectively to try to secure collection from either a creditor sending a representative to the November 2nd creditors' meeting or from a creditor communicating details of Fraim's indebtedness. This raises a jury issue.

Sparks' assertion that Mr. Beddall merely attended the November 2nd meeting because Sparks was a SADV member seeking representation at an association meeting seems weak in the face of the October 26th letter (Exhibit A) which, although written on association stationery, clearly indicates it was a meeting for all member "companies owed money by Fraim" at which a joint plan to secure collection would be discussed. Assuming Mr. Beddall went to the meeting for the sole purpose of such discussion, it does not follow that the plan of action there reached was authorized by Sparks. The resolution recorded in the meeting's minutes was reached mysteriously, for no formal or even informal vote was taken. While Mr. Beddall never gave explicit authorization that Sparks become a member of the creditors' committee or that the confrontation plan be pursued in its interest, this fact issue is raised by the circumstance that Mr. Beddall signed the attendance log and offered information concerning Fraim's indebtedness. Signing the log speaks for itself—Sparks was in attendance—and the creditor information might be given for a variety of reasons other than for the purpose of

confronting Fraim, such as auditing the discussion, enabling members to exchange credit information or otherwise; but a fact issue is nevertheless raised.

Apparent authority is a creature distinct from authority and it is defined in section 8 of the Restatement 2d, Agency, as:

"Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and *in accordance with the other's* manifestations to such third persons." (Emphasis supplied)

The key distinction is that the manifestation of agency is made not to the agent but to a third party. Here, it is evident that Sparks made no direct manifestation to Fraim. The manifestation of the principal to the third party may also be made to the community, by signs, by advertising, by authorizing the agent to state he is authorized, or by continuously employing the agent" (Comment B). The exhibit letters, in particular the "Important Notice," wherein the committee members are named, would be such a sign or advertisement if made up by Sparks or within the authority of Katz. It is interesting to note that it might have been reasonable for plaintiff, on the basis of this letter, to assume Katz was Sparks' agent, but apparent authority does not depend on this element alone.

The inquiry is not foreclosed by the above analysis. It is also possible under the law of the Restatement 2d, Agency, as adopted in the Commonwealth for a person or entity to be responsible for an action committed in the past, even though no formal or informal agency relationship existed at the time of the act. An affirmance is defined as either:

"(a) a mainfestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or

"(b) conduct by him justifiable only if there were such an election": Restatement 2d, Agency, §83.

Such an act can be ratified, and, hence, chargeable to the purported principal, if at the time of the act and at the time of the affirmance the purported principal could have authorized the act: Section 84. Sparks could have authorized Katz to speed forward with his plan at the November 2nd meeting. To determine if it made an affirmance and if at the time of such affirmance it would have authorized the act requires a look at the nature of that term.

The general type of affirmance occurs wherein a purported principal with knowledge of the facts receives certain property or services from an earlier transaction to which he is entitled only if the earlier transaction is validated. The logic of affirmance is the belief that no one should be permitted to retain benefits of an act purported to be done on his account unless he is made responsible for the means by which they have been obtained: §83 Comment C.

Significantly, silence may be an act of affirmance. Restatement 2d, Agency, §94 tells us that "an affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." Comment A to this section specifies "Silence under such circumstances that, according to the ordinary experience and habit of men, one would naturally be expected to speak if he did not consent, is evidence from which assent can be inferred."

There is a jury question open concerning whether Sparks, by its silence after receipt of the "Important Notice" letter which unequivocally identified it as a member of the creditors' committee, did decide to ride along and accept such benefits as the committee's efforts could secure. The Ronald A. Bove Company on November 19th wrote Katz disavowing any status

as a creditor or member of the creditors' committee. Sparks' assertion that such did no good because the Bove Company was still joined as a defendant is deceptive (it certainly would nip any notions of affirmance in the bud) and has all the clarity of 20/20 hindsight. Sparks' silence is all the more curious in light of its failure to reply to Fraim's counsel's letter (assuming receipt which is itself a jury question) threatening suit of the Committee and its members. Indeed, Sparks went so far as to send two representatives to the November 20 meeting.

To be sure the strongest affirmance cases are those wherein there was an existing agency relationship at the time of the act and the agent exceeded his authority and/or where silence is maintained over a long period of time while concrete rewards are accepted. But the absence of these factors does not preclude a jury question. The Restatement is emphatic in declaring that affirmance by silence may occur even if the purported agent was theretofore a stranger to the purported principal, §94, Comment B. This comment (actually the predecessor comment which is essentially identical) is quoted with approval in *Savidge v. Metropolitan Life Ins. Co.,* 380 Pa. 205, 110 A.2d 730 (1955). While the issue has apparently not been raised in contexts outside the attorney-client and husband-wife situations, it seems clear that no extended period of silence is necessary: See Zager v. Gubernick, 205 Pa. Super. 168, 208 A.2d 45 (1965) and Rose v. Rose, 385 Pa. 427, 23 A.2d 693 (1956).

Assuming affirmance can be made out, and Comment A to §94 asserts that whether the inference is to be drawn is for the jury except in the clearest of cases, ratification can be also. At the time of the purported affirmance, approximately November 14-

20, Sparks, by its silence, could have authorized Katz to go forward in its behalf.

There is no doubt that if there is ratification, liability will attach not only for tortious acts but also for defamation. Restatement Agency; 2d, §100 reads:

"Except as stated in Section 101, the liabilities resulting from ratification are the same as those resulting from authorization if, between the time when the original act was performed and when it was affirmed, there has been no change in the capacity of the principal or third person or in the legality of authorizing or performing the original act."

"Section 254 states:

"A principal is subject to liability for a defamatory statement by a servant or other agent if the agent was authorized, or if, as to the person to whom he made the statement, he was apparently authorized to make it."

The fact issues are tissue thin, and, indeed, the legal issue is not much more substantial. However, because of the strictures enunciated in our case law which proscribes summary judgment except in the clearest cases, we have no alternative but to deny the motion.

## ORDER

And now, May 2, 1975, upon consideration of the motion of defendant, F. H. Sparks Company of Pennsylvania, Inc., for summary judgment, together with the memorandum of law and affidavits submitted on behalf of defendants, it is hereby ordered and decreed that the motion of defendant, F. H. Sparks Company of Pennsylvania, Inc., for summary judgment is hereby denied.